# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. QUAWN L. LILLARD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-A-18    Steve R. Dozier, Judge**

---

**No. M2001-02136-CCA-R3-CD - Filed November 15, 2002**

---

The defendant, Quawn L. Lillard, appeals his Davidson County Criminal Court convictions for aggravated robbery and aggravated assault. On appeal, he insists that the convicting evidence is not legally sufficient to support his convictions, and he claims that the trial court should not have admitted the identification testimony of one of the victims. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Edward S. Ryan, Brentwood, Tennessee (at trial); and Dwight E. Scott, Nashville, Tennessee (at trial and on appeal), for the appellant, Quawn L. Lillard.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The events giving rise to the defendant's aggravated robbery and aggravated assault convictions transpired on the evening of August 20, 1999 in West Nashville. Eighteen-year-old Dalton Pitts was visiting his girlfriend, Fatima Jones. Jones lived with her mother, Claudette Burns, at 3861 Georgia Court. On the evening of August 20, Burns was at the residence. Pitts and Jones were in Jones's bedroom; the couple were sitting on the bed, and Pitts was playing Super Nintendo.

A neighborhood "block party" was underway that evening. Area residents were milling about outside, and numerous individuals went in and out of Ms. Burns's residence. At this juncture, the participants' accounts of what happened diverge, and we summarize the evidence from the standpoint most favorable to the state.

Pitts testified that during the evening, he gave Jones a one-hundred dollar bill and asked her to go to the store and get change. Pitts worked as a manager at Krystal, and he needed smaller denominations in bills for bus fare to get to work the next morning. Pitts stated that when Jones returned, she informed him that the store had closed. Pitts continued to play Nintendo, and later two young men appeared in the bedroom doorway. Pitts testified that he recognized one of the men, whom he identified as "Melvin." Pitts said that he had seen Melvin before on the basketball court, but Pitts had never met Melvin's companion, the defendant.

Pitts related that they "asked [him] did [he] want to go to the store so [he] could get some change." Pitts said that he told them "naw," and the men left. The men returned, and "[t]his time when came back, uh, they had a gun." Pitts explained that the gun was a sawed-off shotgun. Melvin was holding the gun, and the defendant demanded that Pitts surrender his money. The defendant asked for the money three or four times. Then the defendant asked Melvin for the shotgun, and Melvin began demanding the money from Pitts. Pitts testified that when he did not comply with the demands, the defendant fired a shot in Pitts's direction that lodged in the bed frame. The shot "just barely missed" his leg, Pitts stated. After the weapon was discharged, Pitts promptly handed over the one-hundred dollar bill, and the men ran out of the house. Pitts related that after the shot was fired, Jones "took off running."

After the men left, Pitts waited a few minutes before he went downstairs. He testified that Ms. Burns contacted the police. During the investigation, Pitts said that Jones told the police that the men were "Melvin" and "Quawn." The police took Pitts downtown where he met with a detective who showed him two different sets of photographs. From one set, Pitts stated that he identified "Melvin." He made no identification from the other set of photographs. Pitts explained that the other man who robbed him did not have hair, whereas all the men in the second set of photographs had hair. Discounting the hair, Pitts testified that the person shown in the sixth picture was the other assailant. Pitts identified the defendant at the preliminary hearing as one of the assailants, and at trial, Pitts again identified the defendant.

Ms. Burns testified at trial that, among others, the defendant and Melvin Waters came to her residence on August 20. Ms. Burns knew the defendant because the defendant's sister lived two houses from Ms. Burns. She did not know Melvin Waters, and she had not seen him before that evening. Ms. Burns said that she wanted the men out of her house, and eventually they left. To keep the men from returning, Ms. Burns walked down the street to find Shawn Lillard, the defendant's sister, to ask for her help.

Ms. Burns located Shawn Lillard sitting outside. While the women were talking, Jones ran outside the house and up to Ms. Burns. Jones was talking about "Quawn." Ms. Burns and Shawn Lillard headed toward Ms. Burns's residence. Ms. Burns testified that when they got to the front door, they heard a gunshot. Ms. Burns said that she entered the house, and Melvin Waters ran past her and out of the house. Ms. Burns tried to stop the defendant. She stated that she stood in his path and wrestled with him. Ms. Burns saw that the defendant was carrying a gun. After the defendant escaped, Ms. Burns went upstairs to check on everyone. Ms. Burns testified that she

found Pitts in the bedroom, and she saw the bullet hole in her daughter's bed. She described Pitts as being "very upset." Ms. Burns could not recall if the television was on in her daughter's room when she entered, but she remembered that the lights were on in the room.

Ms. Burns contacted the police, and after they arrived she identified one of the men as "Quawn Lillard," the defendant. She told the police that she did not know the other assailant's name. Ms. Burns said that Shawn Lillard waited for the police and that she talked to the police when they arrived.

Shawn Lillard appeared and testified pursuant to a material witness summons issued by the trial court. The defendant is her twin brother, and Pitts is her cousin. Shawn Lillard stated that she had been drinking during the evening of August 20. At the time of the robbery, she said that she was sitting outside on a brick wall approximately 30 feet from Ms. Burns's house. Shawn Lillard denied ever seeing the defendant at the Burns residence that evening. She denied that anyone asked her to come to the Burns residence. Shawn Lillard testified that "all [she] heard was someone screaming." Shawn Lillard identified the screamer as Jones. Shawn Lillard claimed that Jones was saying, "Mama, Mama, Mama, Melvin, Melvin." Shawn Lillard said that she asked the girl what was wrong, but Jones refused to tell her.

Shawn Lillard testified that she did not go to Burns's residence after encountering Jones, who was upset and screaming. Shawn Lillard said that Ms. Burns came to her a short time later asking to use the telephone. Ms. Burns wanted to call the police. Shawn Lillard stated that she would not loan a telephone to Ms. Burns because the battery on her cordless telephone was low. Shawn Lillard was asked repeatedly about her brother's whereabouts that evening. Shawn Lillard finally admitted that she saw the defendant that evening; she said that the defendant came up to her while she was sitting outside and asked her for a drink. Shawn Lillard said that no one was with the defendant at that time.

After the police arrived, they questioned Shawn Lillard. She said the police wanted to know the defendant's name, age, date of birth, and other personal information. She denied telling the police that she saw the defendant coming out of the Burns residence. Shawn Lillard claimed one of the police officers threatened her with eviction if she did not cooperate. Shawn Lillard transported Pitts, Jones, and Ms. Burns to the police department to look at photographs. She insisted, however, that she was not asked to look at any pictures and that she did not identify "Melvin" from the photographs.

Detective William Stewart was the lead investigator assigned to the robbery. He spoke with Shawn Lillard at the scene. Detective Stewart testified that Shawn Lillard told him that her brother was involved and that her brother's name was "Quawn." Shawn Lillard also told Detective Stewart that she did run up to the Burns residence, that she saw her brother and Melvin coming down the stairs, and that her brother had a shotgun. Detective Stewart testified that he made no threats or promises to Shawn Lillard to persuade her to implicate her brother.

Detective Jeff Ball was responsible for the photographic lineups that were shown to the robbery witnesses. He testified that he spoke with Shawn Lillard at the police station and that she provided information about "Melvin." Detective Ball entered the information into the police computer, and it identified 53 pages of African-American males with the first name "Melvin." Detective Ball stated that Shawn Lillard identified the robbery suspect "Melvin" by looking through the images on the computer screen. Detective Ball explained that he then put together a photographic lineup containing the co-defendant's picture, and he prepared a separate photographic array containing the defendant's picture. Jones identified both the defendant and the co-defendant from the photographic lineup. Pitts identified only the co-defendant.

The state's final witness was Fatima Jones. She recalled being in her bedroom with Pitts when she first heard someone come into her room. She looked up and saw the defendant and the co-defendant. At first, she was not alarmed; then she heard a demand for Pitts to turn over his money followed by a warning, "I'm not playing with you." Jones testified that when she looked around, she saw the defendant pull out a gun. Jones explained that she was scared, so at that point she jumped up and ran out of the house to find her mother. Jones found her mother and Shawn Lillard, and everyone ran back to the house. Jones stated that halfway to the front porch, the gun discharged. Jones saw both men run out of the house and down a hill. According to Jones, Shawn Lillard gave her brother's name to the police when they arrived. Jones never heard anyone threaten Shawn Lillard. Later, at the police station, Jones was able to identify the defendant and the co-defendant from the photographic arrays.

The police arrested the defendant and Waters. Waters was charged with aggravated robbery of Pitts, aggravated assault of Jones, and with three other offenses (disorderly conduct, resisting arrest, and criminal impersonation) arising from his conduct when apprehended. The defendant was charged only with aggravated robbery and aggravated assault. The defendant and Waters were tried jointly. At the conclusion of the state's proof, the defense rested. The jury convicted Waters of facilitation of aggravated robbery, aggravated assault, resisting arrest, and criminal impersonation. The jury convicted the defendant, as charged, of aggravated robbery and aggravated assault. The trial court sentenced the defendant as a multiple offender to fourteen years for the aggravated robbery to be served concurrently with a six-year sentence for the aggravated assault.

## Sufficiency of the Evidence

On appeal, the defendant complains that the evidence was insufficient to support his convictions for aggravated assault and aggravated robbery. He bottoms his grievance on what he characterizes as the numerous and significant inconsistencies in the testimony of the state's witnesses and their motives to testify falsely. He also refers to the inadequate police investigation, such as the failure to check for fingerprints or recover the shotgun.

A criminal conviction may be set aside only when the appellate court finds that the "evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn.

R. App. P. 13(e).  "A jury verdict, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory." *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978)*; State v. Price,* 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001).  Following the conviction, the appellate court reviews the evidence in the light most favorable to the state and affords the state the benefit of all inferences that may be reasonably drawn from the evidence.  *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978).  This means that issues of the credibility of witnesses and the weight to be ascribed to their testimony are matters entrusted to the trier of fact and are not issues for appellate analysis.  *Price*, 46 S.W.3d at 818.

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of overcoming, *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a) (1997).  A robbery becomes aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "[w]here the victim suffers serious bodily injury."  *Id*. § 39-13-402(a)(1), (2) (1997).

In relevant part, assault is defined as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury."  *Id*. § 39-13-101(a)(2) (1997).  An assault becomes aggravated when, *inter alia*, a defendant "[u]ses or displays a deadly weapon."  *Id*. § 39-13-102(a)(1)(B) (Supp. 2001).

In our view, the evidence presented was sufficient to support a finding beyond a reasonable doubt by a rational trier of fact that the defendant was guilty of aggravated robbery of Mr. Pitts.  The defendant and Waters entered Jones's bedroom and demanded money from Pitts.  When Pitts declined to hand over his money, the defendant fired a sawed-off shotgun, which "just barely missed" Pitts's leg.  At that point, Pitts surrendered his money, and the men ran out of the room.  Likewise, regardless whether Jones was or was not in the bedroom when the shotgun was discharged, she testified that she was in the room and heard the demand for the money and the threat, "I'm not playing with you."  She said that she saw the defendant pull out a gun.  Understandably fearful of being shot, Jones bolted from the room and ran out of the house in search of her mother.  From this proof, a reasonable jury was entitled to conclude that the defendant committed aggravated robbery and aggravated assault.[1]

---

[1] Facilitation of aggravated robbery and facilitation of aggravated assault were the only lesser-included offense instructions given.  Considering the overwhelming evidence that a shotgun was brandished and discharged, the failure to instruct on any other applicable lesser-included offenses was harmless beyond a reasonable doubt.  *See State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002) (where elements distinguishing the greater, charged offense are "uncontested and supported by overwhelming and uncontroverted evidence," failure to instruct may be harmless error).

**Identification Testimony**

The defendant also challenges his convictions in this case on the basis that Jones's pretrial identification should have been suppressed. The defendant argues that the identification was tainted because Shawn Lillard informed Jones that Shawn Lillard had seen the defendant before he went into the Burns residence. The trial court conducted a pretrial hearing on the suppression motion and issued a written order setting forth its findings of fact and conclusions of law.

Our review, at this stage, is quite narrow. Unless the evidence preponderates otherwise, the trial court's findings of fact on suppression issues are to be affirmed. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The trial judge is entrusted to decide questions of witness credibility and to resolve conflicts in the evidence. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). In conducting our review, the "[t]estimony presented at trial may be considered . . . in deciding the propriety of the trial court's ruling on a motion to suppress." *State v. Perry*, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). Our review of the trial court's application of law to the facts, however, is conducted under a *de novo* standard of review. *See Walton*, 41 S.W.3d at 81.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967 (1968)). In *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972), the Supreme Court identified five factors for assessing the reliability, and therefore the admissibility, of an identification. They are: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. *Id*. at 199, 93 S. Ct. at 382. These factors for evaluating the reliability of an identification have been adopted in this state. *See Rippy v. State*, 550 S.W.2d 636, 640 (Tenn. 1977); *Bennett v. State*, 530 S.W.2d 511, 515 (Tenn. 1975).

As the trial court noted in its written order, no evidence or argument is advanced in this case that the procedure conducted by Detective Ball was suggestive in some way. The detective gave a straightforward explanation how the two photographic lineups were constructed by a computerized process. According to the trial court, the physical characteristics of the individuals depicted in the photographs are not "grossly dissimilar," and in many instances are "strikingly similar." *See State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993). We note that the lineups are not included in the appellate record, *see State v. Price*, 46 S.W.3d 785, 812 (Tenn. Crim. App. 2000) (duty of appellant to supply adequate appellate record for determination on the merits); the defendant, however, does not challenge the accuracy of the trial court's characterization, and we perceive no basis to reject the characterization. Moreover, there appears to be no grounds to attack how the lineups were presented to the witnesses. Detective Ball did not suggest to Jones that the defendant's photograph would be among those she would be viewing. Jones, in fact, testified that when the detective showed her the photographs, he told her that the assailants may or may not be in the photographs.

The defendant's argument, consequently, reduces to the claim that Jones's identification of the defendant was tainted by the earlier conversation with Shawn Lillard who said that she had seen her brother before the incident occurred. The trial court examined the factors set forth in *Neal v. Biggers* and found that Jones had two opportunities to view the assailants. The first time was when the men came into the bedroom, and she saw them a second time as they fled from the residence after the shot was fired. At the suppression hearing, Jones testified about the lighting conditions in her room. She believed that the bedroom light was extinguished but that the bathroom light was on; at any rate, Jones insisted that the light from the television, which Pitts was using to play Nintendo, was adequate to see the men clearly. The trial court credited this testimony, as it was entitled to do.

Regarding the witness's degree of attention, the trial court pointed out that Jones recognized the defendant when he entered the bedroom. She saw the gun in the defendant's hand and described it at the hearing as a "sawed off shot gun with no handle." As for accuracy, certainty, and time interval between the crime and the identification, the trial court noted that Jones provided the defendant's name to the police and that she had spoken with both men shortly before the offense was committed. Jones, moreover, testified at the hearing that she knew the defendant particularly well. Detective Ball, the trial court found, said that Jones identified the defendant's photograph "immediately with no hesitation." The lineup itself, the trial court found, was conducted within one to two hours after the robbery. *See State v. Carter*, 682 S.W.2d 224, 226 (Tenn. Crim. App. 1984).

From the evidence presented and weighing the relevant legal criteria, the trial court "accredit[ed] the testimony of the witnesses and [found] that the factors weigh heavily in favor of the reliability of the identification." The identification, therefore, was admitted at trial. Our review convinces us that the trial court applied the correct legal standards and that the proof does not preponderate against its ruling that the identification was reliable and, therefore, admissible.

Based on the foregoing and the record before us, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE