IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 29, 2011

**STATE OF TENNESSEE v. DAVID A. HUNTER**

**Appeal from the Criminal Court for Hamilton County**
**No. 268528      Don W. Poole, Judge**

---

**No. E2010-01351-CCA-R3-CD - Filed April 20, 2011**

---

The defendant, David A. Hunter, appeals his Hamilton County Criminal Court jury convictions of first degree felony murder, *see* T.C.A. § 39-13-202(a)(2) (2006), and attempted especially aggravated robbery, *see id*. §§ 39-12-101(a)(3), -13-403, for which he received an effective sentence of life imprisonment. In addition to contesting the sufficiency of the evidence on appeal, he argues that the trial court erred by denying his motions to suppress his statement and an eyewitness identification. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, David A. Hunter.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William H. Cox, III, District Attorney General; and Neil Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On March 16, 2008, James Fleming, Jr., a cab driver for Mercury Cab Company, was shot in the head during a failed robbery attempt in the St. Elmo area of Chattanooga. He died instantly. Two days later, Chattanooga Police Department (CPD) Detective Justin Kilgore arrested the fifteen-year-old defendant for Mr. Fleming's murder. Although the defendant confessed to shooting the victim, at trial he testified that another individual, Dewayne Johnson, had committed the murder. The jury convicted the defendant, as indicted, of the first degree felony murder and attempted especially aggravated robbery

of the victim.

Steve Troxler, a longtime resident of St. Elmo, was at home with his family on the evening of March 16, 2008, when, at approximately 9:10, he heard a gunshot followed by a crash. He went outside to investigate the source of the noise and discovered that the victim's cab had crashed into a nearby garage. When he looked inside the cab, Mr. Troxler discovered that the victim had suffered a gunshot wound to the left side of his head. Mr. Troxler was about to check the victim's pulse when his wife, a nurse, told him not to because it was "too late." He and other neighbors then waited on the police, who soon arrived. Mr. Troxler did not see anyone running from the victim's cab, but he did recall that there was a wooded area adjoining a cemetery nearby.

Christine Edwards, the victim's niece, regularly rode with the victim in his cab and was doing so on the night of March 16, 2008. She admitted that they had smoked marijuana together earlier in the evening. She rode with the victim to pick up a "fare" in the Alton Park area of Chattanooga. She recalled that the individual entered the back seat of the cab from the driver's side and that he was a young African American male dressed in black clothing and wearing a "black doo rag" on his head. Ms. Edwards later identified the individual as the defendant.

Ms. Edwards testified that the defendant directed the victim to the defendant's destination, a green house in the St. Elmo area. As the cab approached the residence, the victim turned on the interior dome light of the cab. The defendant then placed a gun to Ms. Edwards' head and told her to "give [him] all [her] shit." When Ms. Edwards reached for her purse, the defendant directed her to keep her hands up and then moved the gun to the victim's head. Ms. Edwards described an "ugly confrontation" between the defendant and the victim during which she was ordered out of the cab. As she sat on the curb watching, the victim and the defendant were "tussling" and "wrestling with the steering wheel of the cab." Finally able to put the cab in drive, the victim drove the cab forward, skirting a dumpster before crashing into a shed just as Ms. Edwards heard two gunshots.

After the cab crashed, Ms. Edwards "got up and ran" several houses away from the crash site. She saw the defendant walking toward her, and she entered a home through an unlocked front door. When the homeowner met her in the hallway, Ms. Edwards reported that her uncle had been robbed. The homeowner telephoned the police who arrived "within like a minute."

The police informed Ms. Edwards that her uncle had died. After providing a statement to Detective Kilgore, Ms. Edwards reviewed several photographic lineups but was unable to make any identification of the assailant. She initially described the assailant as

approximately 5'8" in height and weighing 145 to 150 pounds. The defendant, however, weighed over 200 pounds and was taller than 5'8". Ms. Edwards first identified the defendant six weeks later upon seeing him at the juvenile court transfer hearing. Despite the discrepancies between her description of the assailant and the defendant's actual physical characteristics, Ms. Edwards stated, "I recognized him [at the transfer hearing]. I couldn't believe that it was him, but they found him, that was him. The same guy I described, it was him."

Elizabeth Marlar Capecchi lived in the St. Elmo area of Chattanooga on March 16, 2008. As she was putting her youngest son to bed that evening, she heard knocking at her front door and walked to her foyer to find Ms. Edwards in her home. She recalled that Ms. Edwards was "just kind of yelling and screaming and sort of crying." Ms. Edwards told Ms. Capecchi that "[s]omeone tried to mug us" and "he's behind me." Ms. Capecchi looked out the side transom windows of her door to see someone walking up the hill toward Forest Hills Cemetery. She described the individual as a "kind of hefty, stocky black guy," wearing dark clothing and weighing about 220 pounds. She could not, however, see the individual's face.

Doctor James Kenneth Metcalf, Hamilton County Medical Examiner, performed an autopsy of the victim and determined that the victim died from a single gunshot wound to his head which entered above and behind his left ear. The bullet pierced the skull on both sides and came to rest just beneath the skin near the victim's right ear. Doctor Metcalf opined that the victim's death was instantaneous.

Doctor Metcalf removed the bullet and provided it to CPD Detective Chad Rowe who forwarded it to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. The parties stipulated that TBI Special Agent Steve Scott identified the bullet as a .380 caliber automatic. Special Agent Scott could not, however, match the bullet to any handgun due to insufficient markings.

Former CPD Officer Brian Lockhart worked for the CPD crime scene unit in March 2008. He swabbed the victim's cab for blood and other DNA evidence. He also processed the vehicle for latent fingerprints and gunshot residue evidence.

TBI Special Agent James Russell Davis, II, performed microanalysis on items collected by Officer Lockhart. Testing revealed the presence of gunshot residue on the driver's side headrest of the cab. No gunshot residue was discovered on any clothing submitted for testing. Special Agent Davis could not, however, determine the owner of the clothing that was submitted for testing.

TBI Special Agent Jennifer Shipman performed serology testing on samples collected by Officer Lockhart. Of the non-degraded samples submitted, none matched the defendant or Dewayne Johnson. Of the blood samples submitted for testing, all matched the DNA of the victim.

TBI Special Agent Dabney Kirk performed fingerprint analysis of the latent fingerprints collected by Officer Lockhart. Of the seven prints submitted, only three were identifiable. None matched Dewayne Johnson or the victim. One of the three prints matched the defendant. Special Agent Kirk acknowledged that there was no way to ascertain when the print was left on the cab.

Detective Justin Kilgore used telephone logs from the cab company to determine the telephone number of the last fare picked up by the victim. Through the assistance of the cellular telephone carrier associated with the telephone number, Detective Kilgore ultimately determined that the cellular telephone was owned by Leslie Bailey, the defendant's mother. Further assistance from the cellular telephone company enabled Detective Kilgore to determine the precise location of the cellular telephone, leading to the apprehension of the defendant on March 18, 2008.

Detective Kilgore transported the defendant to the CPD service center where he placed the defendant in an interrogation room. Knowing that the defendant was a juvenile, Detective Kilgore contacted the defendant's mother who arrived at the service center at approximately 9:30 p.m.. Detective Kilgore did not question the defendant while awaiting Ms. Bailey's arrival. After a full explanation of his *Miranda* rights, the defendant initialed each right as an indication of his understanding and signed a waiver of his rights. Detective Kilgore, the defendant's mother, and another officer witnessed the execution of the waiver.

After being confronted with evidence concerning the telephone logs, the defendant admitted that, after spending March 16 with friends, he went to "The Villages" where he telephoned the cab company. He used "*67" to block his cellular telephone number from showing on the cab company telephone's caller identification. When the cab arrived, he entered the back seat through the driver's side and directed the cab driver to take him to 44th street in the St. Elmo area. The defendant told Detective Kilgore that there was a female passenger in the front seat with the driver. When the cab stopped, the defendant pulled a gun from his pocket and held it to both the cab driver and the female passenger's heads. The defendant ordered the female from the vehicle. When the defendant demanded money from the cab driver, the cab driver "[t]ried to drive off." The defendant admitted to Detective Kilgore that the cab driver "kept trying to drive off and I shot him." The defendant said that the cab driver hit another car before crashing into the garage. When the car stopped,

the defendant fled the scene and walked back to the home of his best friend, Ronald White. He said that he walked though a wooded area and a cemetery on his way to Mr. White's home.

In his statement to police, the defendant said that he was wearing bright green shorts and a black t-shirt. He reported that the gun was a black .38 caliber automatic that he had found in the grass a "couple of days" earlier on Jackson Street. He claimed that he was walking with Mr. White when he found the gun and that he concealed it in the back waistband of his pants. He said that after the shooting, he gave the gun to an unknown black male on his way back to Mr. White's house. The defendant told Detective Kilgore that he looked up the telephone number to the cab company before he left Mr. White's house that night. He said that he planned to rob the cab driver before leaving but that he had no intention to kill anyone. The defendant did not obtain any money from his efforts.

Two days after the defendant made his statement, the defendant's mother, Leslie Bailey, telephoned Detective Kilgore to tell him that the defendant had told her that Dewayne Johnson committed the offenses. Detective Kilgore investigated this information and determined, based upon an interview with Mr. Johnson and the absence of any physical evidence linking him to the crimes, that Mr. Johnson had nothing to do with the shooting.

At trial, Detective Kilgore admitted that the telephone records were not "necessarily indicative" of who had placed the call to the cab company. He also acknowledged at trial that the defendant's physical characteristics differed somewhat from the eyewitness descriptions and that the eyewitness descriptions may more accurately describe Mr. Johnson. He reiterated, however, that the defendant possessed the cellular telephone within two days of the offenses and that the defendant confessed to the shooting. Detective Kilgore also noted that the .380 caliber bullet recovered from the victim was compatible for use in a .38 caliber handgun.

At trial, the defendant testified that he was staying with Mr. White during spring break on the weekend of March 16, 2008. He said that he and his friends spent the day visiting friends. He said that they typically walked but sometimes rode the bus or called a cab to get to their destinations. After visiting several friends during the day, the defendant and Mr. White returned to Mr. White's home where they watched a movie. Sometime during the evening while the defendant and his friends were outside, Mr. Johnson approached the defendant with an offer to make some "quick money." The two men then planned the robbery of a cab driver. The defendant obtained the telephone number to the cab company and telephoned for the cab on his cellular telephone. As the cab approached, the defendant changed his mind and abandoned the plan to assist in the robbery. He gave Mr. Johnson his cellular telephone and asked him to return it to him later that night. The defendant testified

that he watched Mr. Johnson enter the vehicle and ride away, waited a few minutes, and walked to Mr. White's home where he and Mr. White washed dishes and watched another movie.

Sometime after 9:00 p.m., Mr. Johnson called the defendant and returned the cellular telephone to him. In their brief conversation, Mr. Johnson told the defendant the details of the robbery but did not admit any details about the shooting. The defendant testified that he never saw Mr. Johnson again. The victim's murder was reported during the 11 o'clock news later that night. Fearful of being labeled a "snitch," the defendant did not contact the police or say anything to any of his friends concerning his knowledge of the offenses.

The defendant explained that he confessed to the police because Detective Kilgore offered to help him with the judge and also because he thought nothing would happen to him because of his juvenile status.[1] When he realized that he would be tried as an adult, he decided to disclose that Mr. Johnson had committed the offenses. He denied getting into the cab and having any involvement in the shooting. He claimed knowledge of the details of the offenses based upon the brief, yet detailed, conversation between himself and Mr. Johnson.

Ronald White testified at trial that he and the defendant spent the entire day of March 16 together except for about 10 to 15 minutes in the evening when the defendant went next door to visit a neighbor. Mr. White said that when the defendant returned, they washed dishes together and watched a movie. He said that the defendant's demeanor was normal throughout the day and that he had never seen the defendant with a gun, either on March 16 or any other day. On cross-examination, Mr. White acknowledged that the defendant had told him he went next door to visit the neighbor and that he did not actually see the defendant at the neighbor's house. He also expressed surprise that the defendant had confessed to Detective Kilgore that he went to "The Villages," planned the robbery, and shot the victim.

Marilyn Thompson, Mr. White's mother, testified that the defendant was with her son at her home on the evening of March 16. She said that the boys had spent the day "just hanging out" because it was spring break. She recalled that the defendant went next door to the neighbor's home for a few minutes, but she admitted that she did not actually see him there because she had been asleep during part of the evening. She never saw the defendant with a gun that day or any other day. Her son and the defendant left her home at approximately 11:30 p.m. to go visit her son's girlfriend. She was "so surprised" when her son told her two days later that the police "got Alan" for the murder of the cab driver.

---

[1] The record reflects that Mr. Johnson was also a juvenile at the time of the offenses.

LaKeisha Boden, Mr. White's girlfriend, testified that the defendant and Mr. White came to her home around midnight on March 16. She said that she had met the defendant several times before and that nothing seemed unusual about his demeanor or behavior that evening. She admitted that she had no knowledge of what the defendant may have been doing earlier that night.

In rebuttal, the State presented the testimony of Dewayne Johnson who testified that he met the defendant once several weeks before the shooting and that they had gotten into a fight. He said that after that incident, he never saw the defendant again. He denied planning a robbery of the cab driver. He said that he spent March 16 working with his school youth conference and returned home at approximately 7:00 p.m., where he remained for the rest of the night. On cross-examination, Mr. Johnson admitted that he had lied to Detective Kilgore when he told him that he had spent the day playing video games with friends that day.

Based upon this evidence, the jury convicted the defendant, as charged, of the first degree felony murder and attempted especially aggravated robbery of Mr. Fleming. At sentencing, the trial court imposed a life sentence by operation of law, *see* T.C.A. §§ 39-13-202(c)(3), -208(c), for the first degree felony murder conviction and a concurrent minimum sentence of eight years' incarceration for the attempted especially aggravated robbery conviction, upon the recommendation of the State. After he filed a timely motion for new trial, which was denied by the trial court, and a timely notice of appeal, the defendant's appeal is now properly before this court.

## Motion to Suppress Statement

The defendant argues that the trial court erred by denying his motion to suppress his statement made to Detective Kilgore. He specifically argues that his waiver of rights and accompanying statement were involuntary because he was isolated in the interrogation room for several hours prior to giving his statement, not allowed to talk to his mother, and promised assistance by Detective Kilgore in exchange for his cooperation in giving a statement. The State argues that the trial court properly denied the motion because the totality of the circumstances established that the defendant voluntarily and knowingly waived his rights, free of any promises of leniency.

Detective Kilgore testified at the pretrial suppression hearing concerning the circumstances surrounding the defendant's confession. He stated that he took "special precaution" to "make sure [a juvenile] understood what every word was and what they meant for him and his future" when discussing the rights waiver form. He also said that it was "very preferred" to have a parent present at any juvenile interrogation but that a juvenile

court representative was present for any interview in situations when a parent could not be located. In the defendant's case, his mother, Ms. Bailey, was present for the interview. Detective Kilgore did not question the defendant at any time outside the presence of Ms. Bailey. Detective Kilgore also testified that the defendant had full access to food, water, and a restroom while being held for interrogation. The defendant, who had been arrested previously, executed a rights waiver and signified his understanding of each right by initialing each right on the form. Throughout the interrogation, neither the defendant nor his mother requested an attorney or asked that the interrogation be stopped.

Concerning the defendant's allegation that Detective Kilgore offered him leniency in exchange for his confession, Detective Kilgore explained that "[t]here was one point in our interview that I tried to help [the defendant]" by asking about an "accidental firing" of the weapon. Detective Kilgore, however, denied making any promises to assist the defendant with the judge or the district attorney. Detective Kilgore did not recall instructing Ms. Bailey that she could not talk to the defendant.

Ms. Bailey testified that she learned of her son's arrest from his best friend, Mr. White. She arrived at the police station at approximately 9:30 p.m. and was not allowed to see the defendant until more than three hours later. During that time, the defendant sat handcuffed alone in the interrogation room. Ms. Bailey said that the defendant made three separate statements during the interrogation. She said that the defendant initially denied any involvement in the crimes; however, when Detective Kilgore told him that it was "in [his] best interest that [he] tell [the police] the truth," the defendant said, "I killed the cab driver." Ms. Bailey testified that Detective Kilgore advised her not to say anything to the defendant that would interrupt the progress of the statement but that she could tell the defendant that she loved him. She said that she felt like the defendant was pressured into admitting something that he did not do. She said that the defendant's admission upset her so much that she ran from the interrogation room and became sick in the bathroom when she "realized that he said he killed someone and it wasn't true."

The trial court found that Detective Kilgore did not make any promises of leniency to the defendant in exchange for his waiver of rights and confession. The court also found that the defendant knowingly and voluntarily waived his rights and that neither the defendant nor his mother made any attempt to invoke the defendant's right to counsel during the interrogation. The trial court found that although Detective Kilgore's restriction of Ms. Bailey's conversation with the defendant was a "concern," the restriction of communication did not impair the voluntariness of the statement. Accordingly, the trial court denied the motion to suppress the statement.

At the evidentiary hearing, the State had the burden of demonstrating by a

preponderance of the evidence that the defendant's statements were made voluntarily, knowingly, and intelligently. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). A trial court's factual determinations at a suppression hearing are presumptively correct on appeal, *see State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994), and the findings are binding upon this court unless the evidence contained in the record preponderates against them, *see State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *Stephenson*, 878 S.W.2d at 544; *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith,* 978 S.W.2d 861, 864 (Tenn. 1998). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court. *Odom*, 928 S.W.2d at 23. Thus, on appeal, the defendant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowingly and voluntarily given. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). In conducting our review, the "[t]estimony presented at trial may be considered . . . in deciding the propriety of the trial court's ruling on a motion to suppress." *State v. Perry,* 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our supreme court has previously held that "[t]he significant difference between these two provisions is that the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

A defendant may "voluntarily, knowingly and intelligently" waive his rights and provide a statement to the police. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before a defendant can knowingly and voluntarily waive his *Miranda* rights, however, the defendant must be "adequately and effectively apprised of his rights." *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). Furthermore, a confession "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence'" or other evidence of police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted).

In determining whether a statement is made voluntarily, this court must look to the totality of the circumstances surrounding the confession, and the standard is "'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Kelly*,

603 S.W.2d at 728 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). In the context of a juvenile defendant's statement, the consideration of the totality of the circumstances includes:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

*State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998). "These factors are sufficiently capacious to encompass coercive tactics such as . . . promising leniency." *Id*.

In this case, the 15 year-old defendant had completed the eighth grade and was enrolled in the ninth grade at the time of his arrest. The defendant had been previously arrested for robbery and, therefore, had some experience with the juvenile court system. No evidence suggested that the defendant suffered from any impairment or cognitive disorders which would have cast doubt on his ability to voluntarily waive his *Miranda* rights. The defendant's mother was present throughout his interrogation. The trial court specifically found that Detective Kilgore did not make any promises of leniency in exchange for the defendant's waiver of rights and statement. We conclude that the record supports the trial court's findings and ruling that the statement was voluntarily made. Accordingly, we affirm the trial court's denial of the motion to suppress.

Motion to Suppress Eyewitness Identification

The defendant claims that the trial court should have suppressed Ms. Edwards' identification of him made at the juvenile court transfer hearing because, he claims, the identification was unduly suggestive in light of the facts that she was unable to previously

identify him from a photographic lineup and that the defendant was the only person in jail clothing present at the juvenile court transfer hearing. The State contends that, although the identification was suggestive, the trial court correctly ruled that the totality of circumstances showed that the identification was reliable and, therefore, admissible.

Ms. Edwards testified at a pretrial suppression hearing concerning her identification of the defendant. She recalled that she observed the assailant for 10 to 15 minutes during the ride to St. Elmo and the ensuing robbery attempt. She said that when the victim stopped in St. Elmo, he turned on the interior dome light of the cab, allowing her to see clearly the assailant. Ms. Edwards explained that her initial description of the assailant was incorrect because she later realized that she had given the police her own height and weight instead of the assailant's height and weight. She acknowledged that she was unable to identify the defendant from a photographic lineup containing his picture that was presented to her within days of the shooting. She stated, however, that when she saw the defendant in juvenile court six weeks later, there was "[n]o question in [her] mind" that the defendant was the person who had attempted to rob them and shot her uncle.

The trial court found that Ms. Edwards had an opportunity to view her assailant face to face with the interior lights on for some time. The court also found that Ms. Edwards had explained the errors in her initial description of the assailant and had corrected the description. Although Ms. Edwards was uncertain of any photographs presented within days of the shooting, her identification of the defendant upon seeing him at the juvenile court transfer hearing was certain. The court found Ms. Edwards to be credible witness and held that her identification of the defendant was reliable "despite the suggestiveness of the confrontation" in juvenile court. Accordingly, the trial court denied the motion to suppress.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). "[E]ven if the identification procedure was unnecessarily suggestive, suppression is only required when the totality of the circumstances shows that the identification was unreliable." *State v. Scarborough,* 300 S.W.3d 717, 729 (Tenn. Crim. App. 2009). In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court identified five factors for assessing the reliability, and therefore the admissibility, of an identification. They are: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. *Id.* at 199. These factors for evaluating the reliability of an identification have been adopted in this state. *See Rippy v. State*, 550 S.W.2d 636, 640 (Tenn. 1977); *Bennett v. State*, 530 S.W.2d 511, 515

(Tenn. 1975).

Law enforcement agencies make routine use of various identification procedures. With physical and pictorial lineups, a victim is asked to examine the likeness of multiple individuals and to indicate whether the perpetrator is among those individuals presented. These are the preferred methods of identification. *See Cribbs*, 967 S.W.2d at 794. With a showup, the police arrange an observation of the defendant by the victim. *State v. Dixon*, 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983); *see Cribbs*, 967 S.W.2d at 794 (describing a showup as the victim's either being presented with the suspect or a single photograph of the suspect). The showup method of identification is regarded as inherently suggestive. *See State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). As such, its use to identify a person suspected of committing an offense is disfavored "unless (a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Id.* (footnotes omitted).

In the present case, Ms. Edwards was presented with several photographic lineups containing the defendant's photograph within days of the shooting. She was, however, unable to make a certain identification from the photographs. At the first hearing in juvenile court six weeks later, Ms. Edwards saw the defendant and immediately identified the defendant in what was, in essence, a show-up. Ms. Edwards testified that when she saw the defendant in court she was certain that he was the person who shot and killed her uncle. The defendant was the only individual present in the courtroom wearing jail clothing. Concerning the first prong of *Biggers*, the trial court correctly ruled that the identification was inherently suggestive.

As for the second prong, the trial court found that Ms. Edwards observed the defendant in the well-lit interior of the cab for some time on the night of the shooting. We also note that the witness observed the defendant face to face from a close vantage point as he held a pistol to her head and attempted the robbery. The trial court found that although Ms. Edwards' initial description of the assailant was inconsistent with the defendant's physical characteristics, her explanation of the original inconsistencies was credible. The trial judge is entrusted to decide questions of witness credibility and to resolve conflicts in the evidence. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Adding further credence to Ms. Edwards' explanation of the inconsistency is Ms. Capecchi's testimony at trial that the person she saw walking toward the cemetery was "stocky" – a more apt description of the defendant. As stated previously, unless the evidence preponderates otherwise, we defer to the trial court's findings of fact on suppression issues. *See Odom*, 928 S.W.2d at 23. We conclude that the evidence does not preponderate against the trial court's factual findings.

Our review of the trial court's application of law to the facts, however, is conducted under a de novo standard of review. *See Walton*, 41 S.W.3d at 81. The trial court ruled that although the identification procedure was suggestive, the totality of the circumstances showed that the identification was otherwise reliable. Based upon the witness' opportunity to observe the defendant in close proximity while the gun was pointed at her head and her certainty of the identification upon seeing the defendant in juvenile court, we conclude that the trial court properly denied the motion to suppress.

## Sufficiency of the Evidence

The defendant concedes that the evidence presented at trial established the requisite elements of the offenses of first degree felony murder and attempted especially aggravated robbery. He argues, however, that the evidence failed to establish his identity as the perpetrator of the offenses. The State argues that the jury chose to accredit the testimony of the State's witnesses that the defendant was the person who committed the crimes and, therefore, the evidence is sufficient to support the convictions.

We review the defendant's claim attacking the sufficiency of the evidence to support his convictions mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

The State presented evidence showing that the defendant absented himself from friends for a period of time on the evening of March 16, telephoned the cab company from his cellular telephone, entered the cab with the intention of robbing the driver, brandished the handgun toward both Ms. Edwards and the victim, and in the course of attempting the robbery, shot the victim in the head. The police found the defendant's fingerprint in the

victim's cab. Although the defendant presented contrary evidence that Mr. Johnson committed the crimes, the jury chose to accredit the State's proof, as was its province to do. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions of first degree felony murder and attempted especially aggravated robbery.

## Conclusion

The record supports the trial court's denial of the defendant's motion to suppress his statement and motion to suppress the eyewitness identification. The evidence is sufficient to support the defendant's identity as the perpetrator of the offenses. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE