Richard Haynes RIPPY and Joe Ned
Crenshaw, Petitioners,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

May 2, 1977.

Joe P. Lane, Jr., Carthage, Frank D. Farrar, Lafayette, for petitioners.

R. A. Ashley, Atty. Gen., R. Jackson Rose, David Raybin, Asst. Attys. Gen., Nashville, Nat Baxter Key, Jr., District Atty. Gen., Carthage, for respondent.

## OPINION

HENRY, Justice.

Petitioners were convicted of murder in the first degree in the Criminal Court at Hartsville and sentenced to death by electrocution. The Court of Criminal Appeals affirmed the convictions, and we granted certiorari.

These convictions grew out of an armed robbery that occurred on the night of 3 May 1974, of a liquor store located in Hartsville, the county seat of Trousdale County, resulting in one man being killed and another being wounded.

Numerous errors have been assigned and, in view of the gravity of the offense and the severity of the punishment, we consider it appropriate to deal with them seriatim, except to the extent of those patently without merit.

### I.

It is first insisted that the evidence is insufficient to support the convictions. These petitioners were found guilty of murder in the first degree by a constitutionally constituted jury. The verdict of the jury was approved by the trial judge. The Code of Criminal Appeals has determined that the evidence was sufficient to support the convictions. We concur in these findings and conclusions.

## II.

Each petition challenges the action of the Court of Criminal Appeals in sustaining the trial judge's denial of a motion for a change of venue.

The record reflects that the defendants called twelve witnesses, including the two petitioners, in support of their motion. Only three of them were residents of Trousdale County. Much of the testimony was of questionable competence. Viewing it in its most liberal light to the defendants, the testimony was conclusory in character with little or no factual foundation. Defendants called the Sheriff and one of his deputies, the son of one of the victims. The trial judge could have found from their testimony ample support for his denial of the motion.

Great reliance is placed upon an incident which occurred on November 11, 1974, the date upon which a hearing was conducted on a plea in abatement, and involving an alleged assault on petitioners by the surviving victim. Also on the same date there was testimony that a female spectator in the courtroom made certain ugly remarks and used offensive language; and that one of the lawyers was the victim of a mild threat and a threatened assault.

Accepting all these at full and face value, petitioners made no case for a change of venue. We cannot bring ourselves to believe that there was any serious question about a fair trial. The hearing upon the plea in abatement was conducted on November 11, 1974. The petitioners did not move the court for a change of venue until January 3, 1975,[1] a total of fifty-three days after the occurrence of the events upon which the motions were primarily based.

Section 40–2201, T.C.A. provides that venue may be changed where "from undue excitement against the prisoner in the county where the offense was committed, or any other cause, a fair trial could probably not

be had." We find nothing in the record to indicate undue excitement or other cause for a change in the locale of the trial. We note that jury selection was completed in one day and that one of the petitioners did not exhaust his peremptory challenges.

 The matter of a change of venue addresses itself to the sound judicial discretion of the trial judge and his decision must be respected absent an affirmative and clear abuse of that discretion. *Wheeler v. State*, 220 Tenn. 155, 415 S.W.2d 121 (1967).

This assignment is without merit.

## III.

 Petitioners earnestly insist that they were prejudiced by a tainted out-of-court identification. After the jury was sworn, but before the introduction of proof, a motion to suppress was made and an evidentiary hearing was conducted.

After petitioners were arrested in New York City and had been returned to Tennessee, they were placed in confinement in the Smith County Jail at Carthage.[2] While there, A. L. (Slim) Roddy, the surviving victim came to the jail and to the cell occupied by the petitioner, Crenshaw. The Sheriff, according to Crenshaw, said: "Ain't that the one?" Roddy answered in the affirmative. This occurred prior to the preliminary hearing. The then Sheriff of Smith County testified very briefly and said that he took an unidentified man to see petitioners and he said: "Them is the ones."

Petitioners occupied the same cell. It is Rippy's testimony that he left the cell to make a telephone call and while in the jail office he saw a man on crutches, who obviously was Slim Roddy, who got a good look at him.

Both petitioners testified that they had requested that counsel be appointed prior to the identification in the Smith County Jail;

---

1. A non-appealing co-defendant filed a written motion for a change of venue on December 12, 1974. These petitioners filed no formal motion.

2. Confinement in an adjoining county resulted from general inadequacy of the Trousdale County Jail.

however, the trial judge refused to permit them to document their requests.

Subsequently, at the preliminary hearing, Roddy identified the petitioners.

The State called Roddy in opposition to the motion. He insists that he drove over to Carthage at the invitation of his brother and concedes that while there he saw petitioners. He said:

When I saw them, I knowed what they had done.

He testified to the lighting conditions on the premises of the liquor store—floodlights on the outside and on the inside, "three rows of lights plumb through the building, and they is lights around the tops of all the shelves around the store except the front."

He first saw the petitioners when they were inside the store standing at the counter, about two and a half or three feet away from him. After Crenshaw shot his co-worker, Roddy jumped across him, trying to reach his gun. But, he says "I was looking over my shoulder still looking at them, and that one over there shot me with a shotgun."

When asked if their faces made an impression on him he responded: "I see it in my sleep now." He stated positively that the identification at the jail had no effect upon him. He explains his visit to the Smith County Jail as being prompted by a desire to "know whether that was them, or not." He had previously given a description of them to the Tennessee Bureau of Identification. On re-direct examination he testified that he wanted to "ease" his mind; that he was apprehensive over his personal safety since he was the only living eyewitness.

The trial judge specifically found that Roddy's explanation for wanting to see petitioners was entirely reasonable. We concur.

The record is devoid of proof that the identification was rigged or planned, or even that anyone officially connected with the prosecution had any advance knowledge of it or participated to any extent.[3] There was no formal line-up or show-up.

We hold that the out-of-court identification was not so suggestive as to give rise to any substantial likelihood of irreparable misidentification. It, therefore, squares with the great trilogy of cases decided by the Supreme Court of the United States in 1967, viz: *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

In *Wade* the Court spoke in terms of "the degree of suggestion inherent in the manner in which the *prosecution* presents the suspect to witnesses for pretrial identification." (Emphasis supplied). 388 U.S. at 228, 87 S.Ct. at 1933.

In *Gilbert* the Court held that a post indictment, pretrial lineup is a critical stage of a criminal prosecution and, conducting it in the absence of counsel violates the Sixth Amendment and calls into question the admissibility of the identification.

Neither *Wade* nor *Gilbert* is controlling in the instant case since the prosecution was not responsible for the pretrial identification.

In *Stovall*, the Court announced a rule of law that:

[a] claimed violation of due process of law in the conduct of a confrontation depends on *the totality of the circumstances surrounding it.* . . . (Emphasis supplied). 388 U.S. at 302, 87 S.Ct. at 1972.

As we pointed out in our recent case of *Bennett v. State*, 530 S.W.2d 511, 513 (Tenn.1975) "the 'totality of the circumstances' rule of *Stovall* was reaffirmed in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)."

Finally, in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) an attack was made upon a show-up identification

---

3. The Sheriff of Smith County was merely the custodian and played no role in the prosecution.

procedure. This Court had previously upheld the conviction;[4] the United States District Court on the petition for the writ of habeas corpus held that the procedures denied due process and the United States Court of Appeals affirmed. 448 F.2d 91 (6th Cir. 1971). The Supreme Court reversed, holding that the criteria for evaluating the likelihood of misidentification include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. 409 U.S. at 199, 93 S.Ct. at 382.

The identification in this case, made fifty days after the commission of the crime, during a chance encounter having no official sanction, by a witness who had seen petitioners in a well-lighted whiskey store, under circumstances commanding complete attention, and made with devastating certainty, passes muster under the guidelines of *Neil v. Biggers.* The out-of-court identification was not tainted; the in-court identification was absolute, unconditional and independent of the chance encounter. See *Kelley v. State,* 478 S.W.2d 73 (Tenn.Cr. App.1972).

This assignment is overruled.

## IV.

Another major insistence of the petitioners is that the trial judge erred in admitting into evidence certain clothing belonging to the petitioners which was seized as a result of an allegedly illegal search of their New York City apartment.

Petitioners were arrested on the rooftop. of their apartment by two detectives of the New York City Police Department. They had information that petitioners resided in a certain apartment. After taking them into custody they proceeded to search their apartment. When asked if they had permission to search, one of the detectives said:

> I had permission of Mrs. De Jarus Foster who was the sister of the owner of the apartment to search the apartment and look around for what I was looking for.

The other detective conceded that neither petitioner gave permission for the search and testified that it was conducted by permission of "a young lady . . . the sister of the girl that runs the apartment . . . [but who] wasn't living in the apartment."

To our knowledge the matter of the precise relationship that must exist between an accused and a third party authorizing a search of premises owned or occupied by him has never come under the scrutiny of the courts of this state. However, in *Bays v. State,* 529 S.W.2d 58 (Tenn.Cr.App.1975), the Court held that a warrantless search of the defendant's home could not be validated by the consent of one who had no possessory interest. This seems to be in accord with the prevailing law.

Thus, in *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) the Court held that a hotel clerk cannot consent for guests; and in *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) it was held that a landlord cannot consent for a tenant.

As pointed out by Judge Edwards, writing for the Sixth Circuit in *United States v. Nelson,* 459 F.2d 884 (1972) "[t]he concept that a man's home is his castle is an ancient one, . . . ."

> The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter,—but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement.[5]

The Fourth Amendment to the Constitution of the United States provides:

---

4. See *Biggers v. State,* 219 Tenn. 553, 411 S.W.2d 696 (1967).

5. William Pitt, Earl of Chatham, Speech on the Excise Bill.

*Unreasonable searches and seizures.*—The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 1, Section 7 of the Constitution of Tennessee guarantees that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; . . .

These great constitutional guarantees are at the very apex of the personal constitutional rights of the individual citizen—rights that the state must not invade, except under the most "exigent circumstances."

In *Nelson,* the Sixth Circuit catalogues these "exigent circumstances" as follows:

1. Searches of automobiles;
2. Searches incident to lawful arrests;
3. Searches based upon the plain view doctrine;
4. Those based upon consent;
5. Where there is an immediate threat of life; or
6. Those where the officer is in hot pursuit of a fleeing felon.

 The mere existence of these circumstances does not necessarily validate a warrantless search. As pointed out in *Nelson,* the exceptions are "jealously and carefully drawn", *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; there must be a showing by those asserting the exemption that the exigencies of the situation made the search imperative, *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; and the burden is on those seeking the exemption to show the need, *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59.

 We hold that to justify a warrantless search of premises owned or occupied by a citizen as a residence, he must give his consent, or such consent must be given by someone authorized by him, or having a common possessory interest or right, or there must exist a clear right to search under the "exigent circumstances" exemption as herein recognized and limited.

 The search and seizure in this case cannot pass constitutional muster under the Federal or State Constitution, and the evidence seized thereunder was inadmissible. While this was error, we view it as harmless since other competent proof removed all doubt of petitioners' innocence and established their guilt beyond a reasonable doubt. We find it to be harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Bays v. State, supra.*

V.

Petitioners complain that the Grand Jury was not impartial and unbiased and its proceedings were not held secret.

The only statutory disqualification of grand jurors by reason of interest is set forth in § 40–1613, T.C.A.:

If any member of the grand jury is charged with an indictable offense, or is a prosecutor, or if the offense was committed against his person or property, or if he is connected by blood or marriage with the person charged, he shall not be present at or take part in the consideration of the charge, or the deliberations of his fellow jurors thereon.

Almost one hundred years ago this Court, in *State v. Chairs and McNeal,* 68 Tenn. 196, 197 (1877) declared:

[W]e do not understand that our laws require that the grand jurors shall be free from any previous opinion as to the guilt of the accused.

This same language was quoted with approval in *State v. Felts,* 220 Tenn. 484, 489, 418 S.W.2d 772, 774 (1967). This seems to accord with the prevailing view throughout the United States. Thus, in 38 Am.Jur.2d,

Grand Jury, § 7, under the heading, "Effect of bias, prejudice, or interest" we find:

> Generally, in the absence of a controlling statutory provision, a person is not disqualified or incompetent to serve as a grand juror by reason of bias or prejudice on his part, by the fact that he has heard or read about the case under investigation or has even formed or expressed an opinion as to the guilt of the accused, or by his interest in a prosecution other than a direct pecuniary interest. The reasons assigned in support of this rule are that a grand jury, being an accusatory and not a judicial body, has the right and obligation to act on its own information, however acquired; that the oath required to be taken by grand jurors contemplates that they may be called on to act in the cases of both enemies and friends and requires them to inquire diligently into the commission of crimes; and that those who live in the vicinity of the place where the crime was committed know better than others the character of the parties and of the witnesses and are, therefore, particularly proper members of the grand jury. However, there seems no authority which goes so far as to hold that this would be true where the jurors had determined through malice or bribery to violate their oaths. (Footnotes omitted)

We, therefore, hold that in the absence of a statutory prohibition, express malice, bribery or other equally reprehensible conduct, there is no legal objection to a person with bias or prejudice serving as a member of a grand jury. The interest and appearance of justice, however, demand that every reasonable effort be made to insure that grand jurors are reasonably free from prejudice. For example, active or career police officers tend to have an inherent prejudice that should preclude their service. And so with persons known to be inherently opposed to the enforcement of the criminal laws of the state.

Petitioners further contend that certain of the members of the grand jury violated their oath of secrecy. The basis for this assertion is that the spouses of two members were called as prospective trial jurors, and, on voir dire, they indicated that their respective spouses had discussed the case with them.[6]

Section 40–1611, T.C.A. provides that members of a grand jury "shall keep secret the proceedings of that body, and the testimony given" except when disclosure is required by the ensuing section. This statutory provision is deeply rooted in public policy and is vital to the effective functioning of a grand jury. While we do not condone its violation, and look with disfavor upon an unauthorized disclosure of grand jury proceedings, we must look to the underlying policy considerations in passing upon any breach of grand jury secrecy. These considerations are succinctly set forth in 1 Wharton, Criminal Procedure (Torcia 12th Ed.1974), § 221 at 488, 489. We quote with approval:

> The purpose is to imbue the grand jurors with a sense of confidence and security so that they may discharge their duties without apprehension of any hurt from an accused or some other person; to secure the utmost freedom of disclosure of alleged crimes by prosecutors; to conceal the fact that an indictment has been found against an accused who is not yet in custody; to prevent perjury and subornation of perjury to the extent that, if testimony given before the grand jury were known, the accused or a confederate might attempt to disprove it by procuring false testimony; and to protect an accused citizen from public disgrace in a case where there is not enough evidence to support a criminal charge.

After the grand jury has completed its session, and an indictment has been found, and the defendant has been arrested and placed in custody, the reasons for secrecy no longer exist.

We overrule the assignment related to the composition of the grand jury and the breach of its secrecy.

---

6. These prospective jurors were excused.

## VI.

Finally,[7] petitioners insist that so much of Chapter 462 of the Public Acts of 1974 as imposes a mandatory death penalty upon all persons convicted of murder in the first degree (§ 39–2406, T.C.A.) is unconstitutional. The Court of Criminal Appeals, with Judge Russell dissenting, upheld the constitutionality of the death penalty statute.

We dealt with a similar insistence in *Collins v. State,* and *Morgan v. State,* 550 S.W.2d 643 (Tenn.1977). Upon the authority of those cases, we hold that Section 3 of the Public Acts of 1974, carried forward into the Official Code as § 39–2406, T.C.A., contravenes the Eighth and Fourteenth Amendments to the Constitution of the United States. For the same reason, it violates Article 1, Sections 8 and 16 of the Constitution of the State of Tennessee.

After argument was heard in the instant case, and after the release of the first opinions in *Collins* and *Morgan,* the Governor commuted these sentences to life imprisonment. Under the authority of the opinion on petition to rehear in *Collins* and *Morgan,* the judgments of the trial court are affirmed, as commuted to life imprisonment.

Modified and Affirmed.

FONES and HARBISON, JJ., concur.

COOPER, C. J., and BROCK, J., dissent in separate opinion.

BROCK, Justice, dissenting.

I fully concur in the Opinion of the Court except that portion which affirms the penalty of life imprisonment, and, with respect to that issue, I dissent for the reasons stated in the Dissenting Opinion *Collins v. State,* Tenn., 550 S.W.2d 643 released this date.

I am authorized to state that Chief Justice COOPER joins in this dissent.

---

7. We have considered and rejected all remaining assignments of error and do not find it necessary to elaborate upon our reasons.