IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 15, 2011, Session

## STATE OF TENNESSEE v. SHIRLEY LARHONDA GAGNE

**Direct Appeal from the Criminal Court for Campbell County**
**No. 13654   E. Shayne Sexton, Judge**

---

**No. E2009-02412-CCA-R3-CD-FILED-MAY 31, 2011**

---

A Campbell County jury convicted the Defendant, Shirley LaRhonda Gagne, of driving under the influence ("DUI"), third offense; driving on a suspended license, second offense; possession of drug paraphernalia; violation of the seatbelt law; and violation of the open container law.  The trial court sentenced the Defendant to eleven months and twenty-nine days, with 130 days to be served in confinement and the remainder to be served on probation. On appeal, the Defendant contends that: (1) the trial court erred when it admitted into evidence testimony pertaining to a blood sample taken from her; and (2) the evidence is insufficient to support her conviction for DUI, third offense.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Michael G. Hatmaker, Jacksboro, Tennessee, for the Appellant, Shirley LaRhonda Gagne.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William Paul Phillips, District Attorney General; and LaTosha Wassom, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Facts

    This case arises from a two-vehicle accident involving the Defendant.  After this accident, the investigating officer obtained a toxicology report that revealed the presence of

intoxicants in the Defendant's bloodstream. Based on this incident, a Campbell County grand jury indicted the Defendant for: DUI, third offense; driving on a suspended license, second offense; possession of cocaine; possession of drug paraphernalia; violation of the seatbelt law; violation of the open container law; and violation of the registration law. The Defendant proceeded to trial, wherein the following evidence was presented:

Donald Ditty testified that between 6:30 a.m. and 7:00 a.m. on November 12, 2006, as he was driving to work on a Campbell County highway, he saw a car come around a curve in the highway traveling in his lane. The car struck him head-on. After gathering himself, he got out of his car to check on the other driver, whose air bag had deployed. At trial, he identified the Defendant as the driver. Ditty described the conversation he had with the Defendant as "not good," recalling that she was angry and repeatedly told him that her child had been killed on the same highway. After the Defendant began to yell at Ditty, Ditty walked away. Ditty recalled seeing the Defendant get out of her car but testified that she immediately said, "Oh, I've gotta sit down," and sat down on the curb. Ditty never saw the Defendant stand back up.

Trooper Rick Woodward, of the Tennessee Highway Patrol, testified that he had been a trooper since 1989 and that he had received DUI detection training, for which he received updated training yearly. Trooper Woodward was summoned to the scene of the accident in this case, and he described the roadway where the accident occurred as two curves leading into a "straightaway" portion of the highway. Campbell County Sheriff's Deputy Darrell Mongar was already present when Trooper Woodward arrived. From what the trooper could gather at the scene, Ditty was traveling in his proper lane of travel when the Defendant's car struck his car, knocking it partially off the roadway. The Defendant's car was stopped, blocking the southbound lane of traffic.

When the trooper arrived, the Defendant was speaking with Deputy Mongar on the passenger side of her vehicle. The trooper recalled that the Defendant's erratic behavior prompted the trooper to ask her whether she had been drinking: "[H]er behavior, her ability to stand, her balance, you know, the bloodshot eyes, the slurred speech, the jumping back and forth, one minute hysterical, the next minute crying. The next minute she would be indifferent." The Defendant admitted to the trooper that she had been drinking at a friend's house. When he asked her why her eyes were bloodshot and watery, she responded that she had been "partying" at a friend's house the night before, and she had not slept in a day and a half. The Defendant also admitted to the trooper that she had taken "pills" before the wreck and, specifically, that she had taken a hydrocodone an hour to an hour and a half before the wreck. She also admitted that she was not wearing her seatbelt at the time of the wreck.

The trooper testified that, due to the Defendant's slurred speech, bloodshot eyes, and

2

general demeanor, he believed the Defendant was under the influence of an intoxicant at the time of the collision. He testified that her statements that she had been drinking, had taken medications, and had not slept in a day and a half confirmed his suspicion. Trooper Woodward testified that, although under normal circumstances he would have required the Defendant to perform field sobriety tests, he declined to do so because the Defendant began to complain of chest pain and requested to be transported to the hospital. The trooper alerted emergency medical personnel, who were already on the scene, to the Defendant's condition, and an ambulance transported the Defendant to the hospital.

As the Defendant was transported to the hospital, Trooper Woodard stayed behind to arrange for the wrecked vehicles, which were blocking traffic, to be towed. Upon performing an inventory search of the Defendant's car, he noticed that the Defendant's purse had fallen into the passenger-side floorboard and that two amber-colored pill bottles had apparently rolled out of the purse. The trooper opened the larger pill bottle first and found that it held a plastic baggie containing a white, powdery substance. The trooper next opened the second pill bottle, which he described as a small "nitro pill bottle . . . about as long as my finger." This bottle also contained white powder. The trooper seized both bottles and began to inventory the items within the Defendant's purse. Inside the Defendant's purse, he found a glass tube with a screen at one end, which he recognized as a "crack pipe." The trooper also observed an open, half-empty can of beer, which was still cold to the touch, lying in the floorboard. The trooper seized the beer can as well as the crack pipe.

Trooper Woodward was soon called away to another incident, and he sent Deputy James Skeans to the hospital where the Defendant was being treated. Deputy Skeans later provided Trooper Woodward with a "TBI blood kit" taken from the Defendant. The trooper turned this, as well as the items seized from the Defendant's car, over to the TBI on November 15, 2006. Two days after the accident, the trooper obtained the Defendant's "certified driver record" from the Tennessee Department of Safety, which indicated that the Defendant's license was suspended. This record was entered into evidence at trial.

Deputy James Skeans of the Jacksboro Police Department testified that on November 12, 2006, he was dispatched to St. Mary's Hospital to inquire whether the Defendant would submit to a blood alcohol test. When he arrived, he found the Defendant lying in a hospital bed, and he perceived her to be "disoriented"stating, "Her speech was a little bit slurred. Kind of seemed like she wasn't all there, wasn't really able to focus, answer a lot of questions. Just kind of seemed as if she wasn't quite herself." The deputy asked the Defendant to give a statement about her involvement in the collision, and the Defendant, whose I.V. tubes made writing difficult, dictated the following statement to the deputy:

I was driving down the road, and I was thinking about my husband and my

3

husband getting out of prison and him being charged with vehicular homicide. And then thinking of my daughter and her being dug out of the ground, and it made me feel helpless. I just don't care anymore. I was driving and just quit thinking about driving and started thinking about my daughter, and I just drifted away.

While at the hospital, the deputy requested that the Defendant submit to an alcohol/drug screen, and the Defendant acquiesced to this request. The defense objected at this point, requesting proof that the Defendant had signed an implied consent form. The deputy acknowledged that, although his "standard procedure" under these circumstances is to ask a motorist to sign a Tennessee Implied Consent Form, he did not obtain an implied consent form from the Defendant and could not recall whether he read aloud the provisions of the form to the Defendant. The trial court overruled the defense objection.

The State introduced a document from St. Mary's Hospital, and Deputy Skeans confirmed that this document was a consent for blood withdrawal form signed by the Defendant and dated November 12, 2006. The deputy testified that, after the Defendant consented to an alcohol/drug screen, a nurse drew the Defendant's blood and packaged the samples in the TBI blood sample kit box. The deputy then filled out a form that accompanied the kit, placed the form within the box, and sealed the box. Deputy Skeans confirmed that he later gave this blood kit to Trooper Woodward.

On cross-examination, Deputy Skeans confirmed that the Defendant was in the emergency room when he interviewed her and obtained her blood sample. The deputy testified that, although he did not bring an implied consent form to the hospital or read its provisions to the Defendant, he informed the Defendant that she had "the right to refuse" and that "if she did refuse, that it could result in suspension of the license."

Special Agent Stephanie Dotson with the TBI Investigation Crime Lab in Knoxville testified that on November 16, 2006, the Knoxville crime lab received the Defendant's blood samples. On December 5, 2006, Agent Dotson was instructed to test the blood-alcohol content of the blood samples. She analyzed the samples and issued a report, which was introduced into evidence, and she discussed the results of that report at trial. The report indicated that the Defendant's blood sample was "negative" for ethyl alcohol, but Agent Dotson explained that ethyl alcohol was present in the blood sample at a level below .01, the level which yields a "positive" result. The samples were then passed on to the Nashville Crime Lab for drug analysis.

Special Agent Jeff Crews of the TBI Investigation Crime Lab in Nashville testified that he received the Defendant's blood samples for drugs screen analysis. On February 23,

4

2007, the agent analyzed the samples and issued a report, which the State introduced at trial, and the agent explained the results at trial. The agent testified that the sample was "positive" for cocaine; that diazepam was present at 0.05 micrograms per milliliter; and that the sample was "negative" for barbiturates, marijuana, and opiates.

Agent Crews testified that cocaine is a stimulant that can cause impairment. He explained that the body metabolizes or "breaks down" all drugs from their compound form into metabolites in order to "get [the drug] out of the body." He testified that cocaine, however, is one of the few drugs that continues to metabolize or "break down" once inside a test tube. Because cocaine does not stop breaking down once it leaves the body, it is known as an "unstable" drug. He testified that, despite this high-metabolic rate, cocaine was still present in its compound form in the Defendant's blood sample over two months after the sample was collected.

The agent testified that diazepam is the generic name for Valium, a central nervous system depressant with sedative, tranquilizing effects. He explained that a "therapeutic range" of a substance is the amount of the substance one would expect to find in a person's body who is taking the substance for medicinal reasons. He also explained that, when a substance is present at the therapeutic range, one can assume the drug is having its "desired effect." As the therapeutic range for diazepam is 0.02 to 4.9 micrograms per milliliter, the Defendant's 0.05 level of Diazepam was within the therapeutic range. Agent Crews testified that both cocaine and diazepam are "impairing" in the sense that each causes an increase in reaction time and a decrease in critical thinking.

Jacob White of the drug identification section of the TBI Crime Laboratory in Knoxville testified that on November 16, 2006, he received the pill bottles and crack pipe seized from the Defendant's car. The agent performed a variety of tests upon the items to determine whether the items contained controlled substances. His analysis revealed that the large pill bottle containing a baggie of white powder did not contain a controlled substance. Tests performed upon the white powder residue within the crack pipe were "inconclusive." His examination of the small plastic pill bottle, however, revealed the presence of cocaine. On cross-examination, Agent White testified that the small pill bottle contained only "residue" of cocaine.

At the conclusion of evidence, the State retired its charge against the Defendant for violation of the registration law, and the remaining charges were submitted to the jury. The jury convicted the Defendant of DUI, third offense; second offense driving on a suspended license; possession of drug paraphernalia; violation of the open container law; and violation of the seat belt law. The jury acquitted her of simple possession of cocaine.

5

The trial court later held a sentencing hearing, wherein the parties submitted an agreed sentence: eleven months and twenty nine days, with 130 days to be served in confinement and the remainder to be served on probation. The trial court approved this sentence, suspended the Defendant's driver's license for three years, and ordered her to complete alcohol and drug treatment.

The Defendant filed a motion for new trial, arguing that the trial court erred when it admitted TBI analysis of the Defendant's blood sample and that the evidence was insufficient to support her convictions. The trial court denied this motion, and the Defendant filed a timely notice of appeal.

## II. Analysis

### A. Admission of TBI Analysis of the Defendant's Blood Sample

The Defendant first contends that the trial court erred when it admitted the results of the toxicology analysis of a blood sample taken from the Defendant while she was being treated at a hospital after this accident. She attacks the admission of this evidence on a number of bases, which can be consolidated into two basic arguments: first, that the tests were admitted in violation of her Fourth Amendment right against unreasonable search and seizure; and second, that the tests were admitted in violation of Tennessee Code Annotated section 55-10-406 because the investigating officer did not obtain an implied consent form from the Defendant before he ordered the collection of her blood sample.

The Fourth Amendment of the U.S. Constitution sets out the minimum protection from unreasonable search and seizure a state must afford a defendant in a criminal prosecution. *State v. Humphreys*, 70 S.W.3d 752, 760-61 (Tenn. Crim. App. 2001). The Tennessee Implied Consent statute, insofar as it provides procedural barriers to the admission of biological evidence collected from a defendant, expands this protection. *Id*. However, this expanded protection is not of constitutional proportion. *Id*. In order to facilitate review of this issue, we will address the issue of the admissibility of the toxicology analysis in light of the Fourth Amendment separately from the issue of its admissibility in light of the Implied Consent statute. First, however, we will address whether the Defendant has waived review of this issue.

The State contends that, by failing to move to suppress the admissibility of the reports before trial, the Defendant waived review of this issue. The Defendant in his brief does not explain why he did not move to suppress the report before trial.

The Defendant in this case did not move pre-trial to suppress the toxicology reports.

She did, however, object contemporaneously to the State's introduction of the reports at trial based upon the Deputy Skeans's failure to obtain an implied consent form from the Defendant. The trial court overruled her objection, finding that the absence of an implied consent form did not render the reports inadmissible.

Tennessee Rule of Criminal Procedure 12(b)(2) provides that a motion to suppress "must" be filed prior to trial. Rule 12(f) provides that the failure to filed such a pretrial motion constitutes a waiver thereof unless cause is shown for noncompliance with the rule. Tenn. R. Crim. P. 12(f).

We conclude that, in this case, the Defendant has waived the issue of the admissibility of the reports by failing to file a pretrial motion to suppress. *See* Tenn. R. Crim. P. 12(b)(2). However, because the Defendant contemporaneously objected to the reports' admission and because we deem the interests of justice to require consideration of the admissibility of the reports, we elect to review the issue despite the Defendant's waiver. *See State v. Johnson,* 673 S.W.2d 877, 883 (Tenn.Crim . App.1984). In reviewing the trial court's decision to admit the reports, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). This Court conducts its own appraisal of the constitutional questions presented by reviewing the law and applying it to the specific facts of the particular case. *State v. Henning*, 975 S.W.2d 290, 297 (Tenn. 1998).

## 1. Whether the Fourth Amendment Requires the Exclusion of the Reports

The Defendant argues the admission of the toxicology reports in this case violated her right against unreasonable search and seizure because she was not under arrest when her blood sample was taken and did not meaningfully consent to the sample being taken. In its brief, the State does not respond to the Defendant's argument that the Fourth Amendment bars admission of the toxicology reports.

Both the United States and Tennessee Constitutions protect against unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. The Fourth Amendment of the U.S. Constitution proclaims that "the right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Tennessee Constitution provides "people shall be secure in their persons, houses, and papers and possessions, from unreasonable searches and seizures." Tenn. Const. art. I, § 7. The sampling of a person's blood for the detection of the presence of intoxicants is a "seizure" within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 770 (1966); *State v. Blackwood*,

713 S.W.2d 677, 679 (Tenn. Crim. App. 1986).

Generally, to search a person's property, a warrant is needed, and, if a search is conducted without a warrant, "evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d at 629. A trial court accordingly presumes that a warrantless search or seizure is unreasonable unless the State demonstrates that one of the exceptions to the warrant requirement applies to the search. *Id*.

One exception to the warrant requirement includes "exigent circumstances." *Schmerber*, 384 U.S. at 770. Because evidence of an intoxicating substance in a person's blood diminishes shortly after consumption, a compulsory breath or blood test, taken with or without the consent of the donor, falls within this "exigent circumstances" exception. *Humphreys*, 70 S.W.3d at 760-61 (citing *Schmerber*, 384 U.S. at 770). Thus, under this exception, due to the nature of evidence in cases involving intoxicated motorists, the State need not procure a motorist's consent in order to collect a blood sample for the purpose of detecting the presence of intoxicants. *Id*. If probable cause exists to believe that (a) the motorist has consumed an intoxicant; and (b) testing of the motorist's blood will reveal evidence of his or her intoxication, law enforcement need not obtain the voluntary consent of the motorist before collecting his or her blood sample. *Humphreys*, 70 S.W.3d at 761 (citing *Schmerber*, 384 U.S. at 768-72).

Another well established exception to the warrant requirement is where a search or seizure is conducted pursuant to the subject's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Rippy v. State*, 550 S.W.2d 636 (Tenn. 1977). "The sufficiency of the consent depends largely upon the facts and circumstances presented by each particular case. The burden is on the prosecution to prove that the consent was given freely and voluntarily." *State v. Blackwood*, 713 S.W.2d 677, 680 (Tenn. Crim. App. 1986).

In this case, Trooper Woodward ordered the collection of the Defendant's blood without first obtaining a search warrant. He did so, however, after having formed a suspicion that the Defendant, who had recently been in operation of a vehicle involved in traffic accident, was under the influence of intoxicants. This suspicion was based partially upon the defendant's bloodshot eyes, slurred speach, and disoriented demeanor. The Defendant herself confirmed the deputy's suspicion by admitting that she had been "partying" the night before, had consumed alcohol, and had taken "pills," admitting to having taken Hydrocodone as little as an hour and a half before the accident. Also, the deputy knew that the Defendant had been traveling in the opposite lane of traffic when she struck Ditty's car. Based on the deputy's observations and the Defendant's admission, we conclude that Trooper Woodard's

request for the Defendant's blood sample was based upon "probable cause" to believe the Defendant was intoxicated. *See Humphreys*, 70 S.W.3d at 761. As such, and because the Defendant's blood was collected in order to detect the presence of intoxicants in her bloodstream, the collection of her blood sample falls within the "exigent circumstances" exception to the bar on warrantless seizures. The Fourth Amendment poses no barrier to the admission of the chemical analysis of the sample. *See id*.; *Schmerber*, 384 U.S. at 770.

Moreover, we conclude the evidence proves the Defendant consented to the seizure within the meaning of the Fourth Amendment. The Defendant argues her consent was not valid because: an ambulance rather than a police cruiser had transported her to the hospital; she was disoriented at the time she agreed to give a blood sample; and she did not understand she was under suspicion of DUI. She also asserts on appeal that "no field sobriety tests were given" at the scene of the accident. The evidence, however, shows that Deputy Skeans asked the Defendant for a blood sample and informed her of the repercussions of refusing to submit to a blood sample. Nothing in the record suggests either that the officer forcefully extracted the Defendant's blood or that the Defendant lacked the capacity to consent to give blood sample. We conclude that "the facts and circumstances" of this case indicate that the Defendant consented to the blood sample "freely and voluntarily." *See Blackwood*, 713 S.W.2d at 680. Thus, the collection of the Defendant's blood sample also fell within the "consent" exception to the rule against warrantless seizures. *See Rippy*, 550 S.W.2d at 636.

Having determined that the collection of the Defendant's blood sample fell within two separate exceptions to the Fourth Amendment's bar on warrantless searches and seizures, we conclude that the Fourth Amendment did not bar the admission of the toxicology reports concerning the sample. We turn to examine whether the Tennessee Implied Consent statute afforded the Defendant additional protection from the State's collection of her blood sample.

**2. Whether Tennessee's Implied Consent Statute Requires Exclusion of the Reports**

The Defendant contends that Tennessee's Implied Consent statute requires an officer to obtain an implied consent form in order to collect a motorist's blood sample and that, because no such form was collected in this case, the toxicology reports analyzing the Defedant's blood sample were inadmissible. The Defendant further contends that, even if an implied consent form is not strictly necessary, the results of her toxicology reports were nonetheless inadmissible because Deputy Skeans failed to adequately explain her right under the Implied Consent statute to refuse to give a blood sample.

The State responds that the Tennessee Code does not require an officer to obtain an implied consent form in order to collect a blood sample. The State contends that the statute requires only that a motorist have completed an implied consent form in order to be

9

prosecuted for violation of the implied consent law. The State argues that, once a motorist consents to give a blood sample, the Implied Consent statute has no bearing on the admissibility of evidence relating to the blood sample.

In Tennessee, "[i]n addition to the exigent circumstances established by the nature of the evidence in cases involving intoxicated motorists, the statutorily created implied consent of the motorist permits the warrantless search of the motorist's breath or blood." *State v. Humphreys*, 70 S.W.3d 752, 761 (Tenn. Crim. App. 2001). Tennessee Code Annotated section 55-10-406(a)(1) provides that anyone who drives a vehicle in Tennessee "is deemed to have given consent" to a test for alcohol or drug content in the blood, provided that "reasonable grounds to believe such a person was driving under the influence of an intoxicant or drug" exist. The Tennessee Code thereby supplements the constitutional basis for a warrantless drug or alcohol test by deeming a motorist to have "consented" to such a test.

A motorist need not be under arrest or in physical police custody in order for his or her implied consent to arise under the terms of the Implied Consent statute. *State v. Kelly A. Hancock*, No. 01C01-9804-CC-00191, 1999 WL 298219, *6 (Tenn. Crim. App., at Nashville, May 12, 1999). Under the statute, once a law enforcement officer has reasonable grounds to believe a motorist is under the influence of an intoxicant, the officer may administer a drug or alcohol test without further ascertaining whether the motorist consented in a subjective sense to the test. *See State v. Michael A. Janosky*, No. M1999-02574-CCA-R3-CD, 2000 WL 1449367, at *4 (Tenn. Crim. App. At Nashville, Sept. 29, 2000), *no Tenn. R. App. P. 11 application filed*.

"In order to avoid potentially violent confrontations between private citizens and law enforcement officers," however, the Implied Consent Statute allows a motorist to "refuse" to submit to an alcohol or drug screen, with a resulting loss of his or her driver's license for one year. T.C.A. § 50-10-406(a)(3). In such a case, a defendant may execute an "implied consent form," indicating that he has been informed that his refusal will result in the one-year loss of his license. T.C.A. § 55-10-406(a)(2). With proof that the motorist was "advised of the consequences of such a refusal," which usually consists of an implied consent form signed by the motorist, the State may prosecute the Defendant for "violation of the implied consent law," which, if successful, results in the loss of the motorist's license for one year. *See* T.C.A. § 55-10-406(b).

The Implied Consent statute's refusal provision does not affect the constitutional and statutory bases for performing a warrantless search of a motorist's blood. Rather, it allows law enforcement to avoid a dangerous confrontation with an unruly motorist while also penalizing the motorist for refusing to comply with the test. "[T]o carve out a rule of exclusion where the [refusal] provisions . . . have not been followed" is not the purpose of

10

the Implied Consent statute. *Hancock*, 1999 WL 298219, *7. Therefore, a motorist's consent to a drug or alcohol screen is not contingent upon whether he has executed an implied consent form; it is present from the moment "reasonable grounds [exist] to believe such a person was driving under the influence of an intoxicant or drug." T.C.A. § 50-10-406(a)(1). Only a motorist's "express refusal" affects the admissibility of a drug or alcohol screen performed upon a motorist suspected of driving under the influence; the absence of his subjective consent does not affect such a test's admissibility. *See Humphreys*, 2001 WL 844400, at *7; *Janosky*, 2000 WL 1449367, at *4.

In this case, the Defendant chose to operate a vehicle and thereby subjected herself to the Implied Consent statute. The Defendant's driving behavior, her demeanor, and her own admissions provided Trooper Woodward with "reasonable grounds" to believe the Defendant was "driving under the influence of an intoxicant." T.C.A. § 55-10-406(a)(1). Further, nothing in the record suggests that the Defendant expressly refused to submit to the blood collection. Though he did not bring, read, or have the Defendant sign an implied consent form, Deputy Skeans informed the Defendant of her right to refuse a blood sample and explained the repercussions of refusing to give such a sample. Contrary to the Defendant's arguments on appeal, the Implied Consent statute requires law enforcement neither to read aloud the exact language of the implied consent form nor to obtain a signed implied consent form in order to collect a motorist's blood sample. Rather, the statute requires only that an officer advise a motorist that refusal to submit to blood testing may result in a one-year loss of driver's license. *See*, *e.g.*, *State v. Kain*, 24 S.W.3d 816, 820 (Tenn. Crim. App. 2000).

The Defendant's contention that her consent was involuntary because she merely was responding to the Deputy Skeans's request is misplaced. As discussed above, a motorist's subjective consent is unnecessary because a motorist has already consented by driving a vehicle upon the public roads of Tennessee. *See Humphreys*, 2001 WL 844400, at *7; *Janosky*, 2000 WL 1449367, at *4. Only a motorist's express refusal bars collection of a blood sample under the Implied Consent statute. *Id*. In this case, nothing in the record suggests that the Defendant made any express refusal to submit to the blood sample that Deputy Skeans requested. As such, the Implied Consent Statute did not bar collection of the Defendant's blood sample, and the trial court properly admitted the results of the TBI's analysis of her blood sample at her trial. The Defendant is not entitled to relief on this issue.

### B. Sufficiency of the Evidence to Support DUI, Third Offense

The Defendant contends that, even if the TBI reports were properly admitted, its contents were insufficient to support the jury's finding that the Defendant operated her vehicle "under the influence of an intoxicant" within the meaning of Tennessee Code

Annotated section 55-10-401(a)(1) (2009).  She argues that, because the report revealed the presence of diazepam at or below therapeutic level and indicated only that cocaine was "present," the report did not contain enough information upon which a jury could conclude that the Defendant was "under the influence of an intoxicant."

The State responds that, given Agent Crews's testimony that the combination of diazepam and cocaine has an intoxicating effect, the report alone was enough to support the Defendant's conviction.  Further, the State argues, Agent Crews testified that, because the sample was tested for cocaine two months after being collected, the fact that cocaine was present at all speaks to the likely high levels of cocaine that were originally present in the blood sample.  The State argues that the Defendant's own admission that she had taken pills before driving and witnesses' testimony that the Defendant appeared intoxicated also support the Defendant's conviction for driving under the influence.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone."  *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993).  The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury."  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).  In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956).  "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859.  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

12

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant in this case contests the sufficiency of the evidence to support her conviction for DUI, third offense. A person commits the offense of DUI when he or she drives an automobile while "[u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system . . . ." T.C.A. § 55-10-401 (2009). The statute imposes strict liability without reference to a culpable mental state. *See State v. Turner*, 953 S.W.2d 213, 216 (Tenn. Crim. App. 1996).

First, our review of the record reveals that, contrary to the Defendant's assertion on appeal, the Defendant had a level of diazepam within the therapeutic level. Agent Crews testified that diazepam's therapeutic range is between 0.02 and 0.4 ml/mg, and that the Defendant's blood contained 0.05 ml/mg of diazepam. The Defendant, therefore, had a therapeutic level of diazepam, which, according to the agent's testimony, was sufficient to have the "desired effects" of sedation and tranquilization. Thus, the presence in the Defendant's blood of diazepam at the therapeutic level was evidence supporting the jury's finding that the Defendant was operating a vehicle under the influence of an "intoxicant" within the meaning of the DUI statute. *See* T.C.A. § 55-10-401.

The level of diazepam present in the Defendant's bloodstream was not the only evidence that the Defendant was under the influence of an intoxicant. Agent Crews's analysis of the Defendant's blood sample also revealed the presence of cocaine compounds. This discovery was important in light of the continued metabolic breakdown of cocaine once cocaine enters a test tube. The presence of cocaine in the blood sample over two months after the sample's collection also supports the jury's finding that the Defendant was under the influence of an intoxicant.

13

Finally, the Defendant's behavior and admissions corroborate the results of the alcohol and drug screens of the Defendant's blood sample. The Defendant was driving in the wrong lane of traffic when she struck Ditty's car. Both Ditty and Trooper Woodward testified that the Defendant displayed erratic behavior, including slurred speech, bloodshot eyes, and an unpredictable temperament. Considering these observations, in conjunction with her admissions that she spent the previous night "partying," consuming alcohol, and taking "pills," the evidence was more than sufficient to support the jury's verdict that the Defendant operated her vehicle while under the influence of an intoxicant. *Goodwin*, 143 S.W.3d at 775. We conclude the evidence is sufficient to support her conviction for DUI, third offense. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the trial court did not err in admitting into evidence the toxicology reports, and the evidence sufficiently supports the Defendant's conviction for driving under the influence, third offense. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

14